No. 31,876

THE STATE OF KANSAS, *Appellee*, v. T. B. BOYD, *Appellant*.

(38 P. 2d 665)

Opinion filed December 8, 1934.

*Leon W. Lundblade,* of Beloit, and *Tinkham Veale,* of Topeka, for the appellant.

*Roland Boynton,* attorney-general, *Lester M. Goodell,* county attorney, *Paul L. Harvey,* assistant county attorney, and *S. M. Brewster,* of Topeka, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: The appellant, T. B. Boyd, was state treasurer. He and Ronald Finney were jointly charged in two counts with the violation of R. S. 75-2415. Upon his separate trial he was found guilty and sentenced, as that statute provides, and he has appealed.

The state treasurer, in addition to other duties imposed by law, is the fiscal agent of the state. All bonds issued by the state, or any county, township, school district, or municipality of the state, are payable at his office, and he is liable on his official bond for all funds coming into his hands on account of such agency. (R. S. 10-501 *et seq.*) Other moneys, or funds, aggregating large amounts, are in his possession, or custody, as state treasurer. Provision is made by statute (R. S. 75-2401 *et seq.*) for the deposits of state funds in banks. Shortly stated, so far as here pertinent, these statutes provide that the board of treasury examiners, consisting of the governor, secretary of state and state auditor, shall meet on the first Monday of July of each odd-numbered year and prepare and cause to be published a notice that on a date stated they will receive sealed proposals from banks doing business in Kansas for the deposit therewith of public funds of the state, the proposals to be deposited with the state treasurer and opened by the board on the date stated in the notice. From the banks making such proposals the board designates certain of them as state depositories, in accordance with certain rules and limitations provided by statute, and designates the accounts so deposited as active or inactive accounts. Each bank so designated as a depository, as security for such deposit and for the faithful performance of its duties as such depository, and before any of the state funds shall be deposited with it, shall deposit with the state treasurer bonds of the United States, of the state of Kansas, or of some county, school district, or munic-

ipality of the state, of the face value equal to the amount of the state funds deposited with it (modified to seventy per cent of the state funds deposited, and in some other respects by chapter 162 of the Laws of 1933, effective March 20 of that year). The bonds so deposited, if issued by any county, school district, or municipality, before being accepted by the state treasurer, shall have attached thereto a certificate of the attorney-general that such bonds are regularly and legally issued and are valid and binding obligations of the issuing body. The state treasurer is custodian of the bonds deposited by such state depositories, and he and his sureties are made responsible for their safekeeping, and are liable therefor. R. S. 75-2415 reads:

"The making of profit by the state treasurer out of any moneys in the state treasury, the custody of which the state treasurer shall be charged with, by loaning, depositing, or otherwise using, or disposing of the same in any manner whatsoever not provided in this act, or the removal by the state treasurer, or by his consent, of any bonds deposited by any bank under the provisions of this act out of the vaults of the treasury, or failing to return or dispose of said bonds according to law, shall be deemed a felony, and on conviction thereof subject him to punishment by imprisonment in the penitentiary for the term of not less than two or more than five years, and he shall also be liable, under and upon his official bond, for all profits realized from such unlawful using of said funds; and it shall be the duty of the attorney-general to enter and prosecute to final termination all suits for a violation of any of the provisions of this act."

The first count of the information (omitting the formal opening and closing) charged:

". . . that T. B. Boyd, the duly elected, qualified and acting treasurer of the state of Kansas, at the county of Shawnee, in the state of Kansas aforesaid, and within the jurisdiction of this court, on the — day of July, A. D. 1933, did unlawfully, feloniously and willfully remove and by his consent allow to be removed out of the vaults of the treasury of the state of Kansas refunding bonds of the city of Eureka, Kan., numbered one to twenty, inclusive, of the face amount of one thousand dollars ($1,000) each, and bearing interest at the rate of four and three-fourths per centum per annum; condemnation bonds of the city of Kansas City, Kan., numbered eighty-eight, one hundred fifteen to one hundred nineteen, inclusive, and one hundred twenty-five to one hundred twenty-eight, inclusive, of the face amount of one thousand ($1,000) each, and bearing interest at the rate of four and three-fourths per centum per annum; bonds of rural high-school district No. 5, Brown county, Kansas, numbered twenty-seven and twenty-nine, of the face amount of one thousand dollars ($1,000) each, and bearing interest at the rate of four and three-fourths per centum per annum; all of the face amount of thirty-two thousand dollars ($32,000), deposited therein by the Eureka bank, a banking corporation of

Eureka, Kan., under the provisions of chapter 75, article 24, Revised Statutes of Kansas of 1923, and Ronald Finney did then and there unlawfully, feloniously and willfully counsel, aid and abet the said T. B. Boyd in such removal, . . ."

The second count of the information was similar to the first, but related to other bonds of similar character of the face amount of $118,600, and alleged that the crime charged in this count was another and different crime from that charged in the first count.

The record shows no substantial controversy concerning the material facts, which may be stated as follows: The appellant, T. B. Boyd, was the duly elected, qualified and acting state treasurer of Kansas, serving his third term as such. The Eureka bank was a state bank at Eureka. Howard B. Tucker was its president and his son, Edwin Tucker, its vice president. It had been a state depository for several years. The Fidelity State & Savings Bank was a state bank of Emporia. Its president was W. W. Finney, a brother-in-law to Howard B. Tucker. These banks had accounts with each other, and each of them had an account with the National Bank of Topeka, which also was a state depository. Ronald Finney is the son of W. W. Finney. He appears not to have resided in Topeka, but for several months prior to the incident which gave rise to this prosecution he had rooms at one of the hotels at Topeka, where he transacted a variety of businesses on a large scale. Among other things he had numerous and large transactions on the Chicago Board of Trade, and he dealt extensively in municipal bonds. Many of these proved to be forgeries. (See *State v. Finney*, 139 Kan. 578, 32 P. 2d 517.) He transacted business with several state officers and exerted himself to be agreeable with them. He and the appellant, T. B. Boyd, became very friendly. Boyd visited his offices in the hotel and Ronald Finney was a frequent visitor at the office of the state treasurer, who accommodated Finney on a number of occasions by cashing his checks and holding them for a few or several days. On one occasion Ronald Finney had the brokerage firm with whom he transacted business at Chicago wire Boyd $500, and on another occasion $700. There is no explanation in the evidence as to what these payments were for. On one occasion Ronald Finney paid the wife of T. B. Boyd $2,500, and on another occasion $3,500. There is testimony that Ronald Finney represented these to be profits from Board of Trade dealings conducted by Ronald Finney with $1,200 originally advanced to him for that purpose by T. B.

Boyd and his wife. Ronald Finney also had transactions with the National Bank of Topeka. About June 29, 1933, Ronald Finney was anxious to take out of that bank about $150,000 worth of bonds which previously he had sold or pledged to the bank. The reason he was anxious to take those out of the bank appears by inference only from this record, and since it is not material here we shall not go into it. Ronald Finney asked T. B. Boyd, as state treasurer, to make an additional deposit of state funds in the Eureka bank of $150,000, so that he, Ronald Finney, might borrow the money from that bank to use in a business deal. He told Boyd the deposit would be secured by municipal bonds for the full amount of the deposit. Boyd agreed to this, and told the assistant state treasurer to make out a check for $150,000, transferring state funds in that amount from the National Bank of Topeka to the Eureka bank.

Ronald Finney then called Edwin Tucker and asked him to come to Topeka, which he did on June 30, and met Finney in his room at the hotel. There Ronald Finney said he had arranged an additional deposit of state funds for the Eureka bank, and told Tucker to go to the state treasurer's office where he would be given a check for the additional deposit. Tucker went to that office and the assistant state treasurer gave him a check for $150,000 of state funds, drawn on the National Bank of Topeka, payable to the Eureka bank. Tucker returned to Ronald Finney's room at the hotel with the check and there remonstrated because of the amount, which he thought was too large for a small bank to use profitably. While they were discussing that matter W. W. Finney came into the room. Tucker was then informed that Ronald Finney and W. W. Finney desired to discuss a business proposition, was asked to withdraw from the room, but to be about the lobby of the hotel where they could call him later. Without detailing the evidence on the point it is sufficient to say that this check of $150,000 was so used as to take from the National Bank of Topeka the bonds Ronald Finney desired to remove therefrom and so that the bonds became the property of the Eureka bank. Bonds of the face amount of $136,600 were deposited with the state treasurer that evening after regular business hours, and the usual temporary receipt executed by the state treasurer for them the next day, July 1, 1933. The remaining $14,000 of the bonds were deposited with the state treasurer on July 8, 1933, and a temporary receipt issued for them. These bonds were deposited with the state treasurer by the Eureka bank to

secure the additional deposit of $150,000 of state funds made with that bank by the state treasurer's check of June 30, 1933. When such bonds were deposited by a bank with the state treasurer to secure its deposit of state funds it was the ordinary practice for the state treasurer to issue a temporary receipt for the bonds. Thereafter the bonds would be submitted to the attorney-general for his approval as to their legality, and after being so approved a permanent receipt would be issued. It does not appear that these bonds were submitted to the attorney-general for his approval as to their legality, and the temporary receipts were retained in the office of the state treasurer instead of being sent to the Eureka bank. On July 10, 1933, the state treasurer delivered to Ronald Finney, and permitted him to withdraw for the Eureka bank account, bonds of the total amount of $32,000, leaving a balance of $104,600 of the bonds referred to in the temporary receipt of July 1, 1933. A statement showing the receipt of such bonds by Ronald Finney was written on that temporary receipt. On July 20, 1933, the state treasurer delivered to Ronald Finney, and permitted him to withdraw, the full amount of the remainder of those bonds shown by that temporary receipt, and also the full amount, $14,000, of the bonds shown by the temporary receipt of July 8, 1933. The evidence disclosed that Ronald Finney was not an officer, director, or even a stockholder of the Eureka bank, and that he had no authority to represent the Eureka bank in withdrawing its bonds deposited with the state treasurer to secure state funds deposited with it. The explanation given by the state treasurer to one who talked to him about the matter, the evidence discloses, was that Finney went to the state treasurer and told him that he could clear up that $150,000 transaction, but to do it he wanted to take the bonds which had been put up as security for the deposit by the Eureka bank to Chicago and sell them and after that he would pay the Eureka bank and return the money on deposit to the state; and that this was agreed to by the state treasurer, who sent one of his assistants, Coryell Gove, as a bodyguard to Finney, who took the bonds to Chicago; that Finney "carried the bonds and Gove carried the gun," and that Finney telephoned him from Chicago, or some place, that everything was all right; that Ronald Finney later promised to straighten the thing up, but never did so; that he had trusted Finney, and Finney had deceived him. There is evidence that on the occasion when Ronald Finney went to

Chicago with the assistant state treasurer, Gove, he placed a number of bonds with the brokerage firm at Chicago with which he transacted business and drew $80,000 in cash, and that the bonds so left with the commission firm proved to be forged bonds of no value. It later developed also that there were other forged bonds in the state treasurer's office of the amount, in the aggregate, of several hundred thousand dollars, which had been placed there to secure state funds deposited in the Fidelity State & Savings Bank of Emporia and the State Bank of Neosho Falls, both of which Ronald Finney presumed to represent. Some of the facts relating to these bonds and the way they were handled became known about August 8, 1933, with the result that the Eureka bank was taken charge of by the bank commissioner and later a receiver put in charge of it.

The material facts, as above stated, were not controverted. They show, of course, two clear violations of the statute (R. S. 75-2415) above quoted.

Turning now to the questions argued. Complaint is made that the court refused a continuance applied for. The warrant for defendant's arrest in this case was issued September 28, 1933. In due time he was bound over to the district court and an information filed. A motion to quash the information was argued and sustained January 9, 1934. The state was given permission to file an amended information, which it did at once, and the case was set for trial January 15, 1934. Defendant then moved for a continuance, supporting the motion solely by the affidavit of his counsel. This motion and affidavit set out that the so-called "bond scandal" was discovered about August 9, 1933; that defendant's counsel had represented him from that date; that much publicity was given to the matter by the newspapers throughout the state, including newspapers at the state capital, in which county the action was to be tried; that as a part of the result of the so-called bond scandal two state officers had been impeached by the house of representatives and their impeachment trials were set for hearing in January before the state senate, which action caused much more general discussion and newspaper comment. It was further contended defendant did not have time sufficiently to consider the amended information. There is no showing that any of these matters affected defendant to his detriment. We find no error in the court's ruling.

Defendant's motion to quash the amended information was overruled. Complaint is made of that ruling: (1) Because the infor-

mation did not charge the defendant made a profit in the transactions complained of. It is true the statute (R. S. 75-2415) makes it an offense for the state treasurer to so handle the bonds deposited with him as to make a profit, but the statute clearly makes it a separate offense for the state treasurer to remove or give his consent to the removal of any of such bonds from the vaults of the state treasury, irrespective of whether he makes a profit out of the transaction. This is the specific offense charged in the information. It was not necessary, therefore, for the information to charge that he made a profit from the transaction. (2) It is contended the bonds, which it is charged were removed, were not sufficiently described. We think there is no lack of clarity in this respect. There is no contention that defendant was misled in this regard, or in any manner hampered in his defense. The receipts shown in the evidence clearly indicated the bonds deposited by the Eureka bank were removed. There is no suggestion these were not the same bonds referred to in the information. (3) That the information does not charge the bonds removed were valid obligations of the municipalities named therein. It is argued, if the bonds were forged they were of no value, hence that the state was in no way hurt by what was done. The state treasurer is not the officer whose duty it is to pass on the validity of such bonds. That is the function of the attorney-general. It is the state treasurer's duty to keep in his custody the bonds deposited with him by banks to secure their state deposits. He cannot justify his failure to perform that duty by showing that the bonds were invalid for some reason. When the state treasurer is charged with the nonperformance of his duty to keep such bonds in his custody the state is not compelled to try the separate issues which might arise in a controversy with reference to the validity of the bonds. (4) It is contended each of the counts is bad for duplicity in that they charged the defendant did "remove and by his consent allowed to be removed out of the vaults of the treasury of the state of Kansas certain bonds." When the facts were shown that the state treasurer gave the bonds to Ronald Finney there should be no quibbling over whether the state treasurer actually took the bonds in his hands and took them out of the vault and handed them to Finney, or whether he told Finney that he could reach his hand into the vault and take the bonds. Obviously the state should not be required to show just which of those two processes actually took place. The charge is that the state treas-

urer removed, and by his consent allowed to be removed, and that Ronald Finney aided and abetted the state treasurer in such removal. This gave the defendant all the information on that point necessary for him to make his defense. And (5) complaint is made that it is not sufficiently charged who the state treasurer allowed to remove the bonds. This contention lacks merit. It was not error for the court to overrule the motion to quash the amended information.

After the court overruled the motion to quash the amended information defendant moved that the state be required to furnish a bill of particulars: (1) By setting out the date of issue and date of expiration of each of the bonds mentioned in each count. Why that information would have been of any special benefit to defendant is not disclosed. (2) By stating the name of the person allowed to remove the bonds. That was sufficiently stated. It was not error to deny this motion.

Complaint is made that the court admitted the testimony of the witness Bernice Long. The facts concerning that are as follows: When the prosecuting officials first learned of the issuance of the check, June 29, 1933, by the state treasurer to the Eureka bank for $150,000, and how that was handled to enable Ronald Finney to get from the National Bank of Topeka the bonds in question, details of which, as shown by the record in this case, have not been stated in full in this opinion, and perhaps at the time were not fully known to the prosecuting officers, the first action taken with reference to the state treasurer was to cause him to be arrested on a warrant issued August 14, 1933, charging him with the embezzlement of $150,000 of the moneys of the state. A preliminary hearing was held September 9, 1933, on the warrant issued on that complaint. At this hearing Bernice Long was a witness called by the prosecution. She testified in substance that at the time in question, and for several years prior thereto, she was an employee in the office of the state treasurer, it being her duty to file and take care of the bonds deposited by banks for the deposits of state moneys; that when such bonds were first brought to the state treasurer's office a temporary receipt for them was issued; they were then presented to the attorney-general for his opinion as to their validity, and if he said they were valid a permanent receipt was issued; that she made out the temporary receipt of July 1, 1933, to the Eureka bank for $136,600 of bonds, and another receipt on July

8, 1933, to the same bank for $14,000 of bonds; that on July 10, 1933, the state treasurer asked her to bring all of those bonds to his office; that she did so; that the state treasurer and Mr. Ronald Finney were there; she was asked by the state treasurer to put the bonds down; she did so, and left the office; that a little later the state treasurer returned the bonds to her, less $32,000 of them, and on the bottom of the temporary receipt issued July 1, 1933, was written the receipt of Ronald Finney for the $32,000 of the bonds; that on July 20, 1933, she was again asked by the state treasurer to bring the bonds to his office. She did so, and there were present the state treasurer and Ronald Finney. She was asked by the state treasurer to leave the bonds, and did so, and there was returned to her both temporary receipts previously issued, on which was written the receipt of Ronald Finney for the full amount of the bonds shown by the temporary receipts. After the hearing of this preliminary examination the complaint was filed in this case, as hereinbefore stated. By the time this case came on for trial in the district court Bernice Long had died. The trial court, over the objection of defendant, permitted the state to introduce in evidence the testimony given by Bernice Long at the preliminary hearing on the embezzlement charge, September 9, 1933. It seriously is contended this is error. We cannot concur in that view. The same transaction was being inquired into in both prosecutions. Indeed, the information in this case could have been filed based upon the preliminary examination held in the embezzlement case, for our statute provides that an information may be based upon the evidence shown at the preliminary examination. (R. S. 62-621; *State v. Handrub*, 113 Kan. 12, 14, 213 Pac. 827.) The evidence at the preliminary examination on the embezzlement charge disclosed the violation of R. S. 75-2415, in that the state treasurer removed and permitted to be removed bonds placed in the state treasury by a bank to secure its deposit of state funds. At that hearing defendant was represented by the same attorneys who represented him in this case, and whose affidavits in this case disclose that they had represented him since August 9, 1933, in all matters growing out of this bond scandal. They cross-examined Bernice Long at that time upon all the matters concerning which she testified on direct examination, which are the very matters involved in this prosecution, and on the hearing of this case they introduced that cross-examination as the cross-examination of that witness. It would be entirely

improper to say that defendant was not confronted with the witness on the very charge embodied in this action. (*State v. Wilson*, 24 Kan. 189; *State v. McManis*, 129 Kan. 376, 282 Pac. 588; 3 Wigmore on Evidence, 2d ed., p. 64.) More than this, the testimony of Bernice Long was largely cumulative. Everything of importance testified to by her was shown by the testimony of other witnesses, or by record evidence, the competency of which is not questioned, except the fact that the state treasurer directed her to take the bonds to his office, who was present at the time, and what transpired there in her presence. The same legal result, however, seems necessarily to follow from the receipts themselves. The bonds were in the custody of the state treasurer, he had executed his receipt for them to the Eureka bank, and Ronald Finney's receipt showed who got them. The only rational conclusion from these receipts themselves is that he got them from or by the permission of the state treasurer. It was not error for the court to admit this evidence.

Complaint is made that the court did not give instructions requested. These instructions embodied the same legal questions raised by the motion to quash the amended information and presented defendant's view of the law pertaining to those questions. We previously have determined defendant's views of the law were not well grounded. It is not necessary to restate them here.

Defendant requested an instruction on intent, to the effect that it must be shown the bonds were removed with a bad or wrongful intent on the part of defendant. The only intent necessary to be proved was the intent to remove the bonds from the vaults of the state treasury. That is the thing made an offense by the statute (R. S. 75-2415). The state was not called upon to prove what motive lay back of that. The requested instruction was properly refused.

Defendant moved the court for an instruction discharging him on the first count of the information on the grounds that under chapter 162 of the Laws of 1933 depository banks were required to deposit bonds for only seventy per cent of the state deposit instead of one hundred per cent of such deposit; that the statute is not definite as to how bonds should be drawn from the state treasury by a depository bank when it has bonds so deposited in excess of the amount required by law; and that when $32,000 of bonds were withdrawn there was left to secure the deposit of $150,000 of state funds bonds in the amount of $118,600, which is more than seventy per cent of

the deposit. The difficulty with that contention is that there is no showing Ronald Finney had any authority to represent the Eureka bank to withdraw any of its bonds for any purpose. The only evidence on the point we find in the record is positively to the contrary. Both Howard B. Tucker and Edwin Tucker testified he had no such authority. The only evidence tending to offset this was a letter of September 30, 1931, from Howard B. Tucker, president of the Eureka bank, to the state treasurer, authorizing him to permit Ronald Finney "to transfer $5,000 of our Kansas municipal bonds from the inactive account to an emergency account, thereby permitting us to hold $40,000 in the inactive account and $5,000 in the emergency account." This letter was written almost two years prior to the transaction complained of and applied to one specific matter only. It tends to show that when the Eureka bank desired Ronald Finney to represent it in any business with the state treasurer it did so in writing and specified the particular business he was authorized to do. It does not tend to show a general authority of Finney to represent the Eureka bank. There was testimony from some of the employees of the office to the effect that Finney was about the state treasurer's office frequently and they got the impression that he was representing what they speak of as "the Finney banks," by which they meant the Fidelity State and Savings Bank of Emporia, the Eureka Bank of Eureka, and the Neosho Falls State bank; but that, of course, is and could be no evidence of his authority, and clearly neither the trial court nor the jury was misled by it. It was not error for the court to deny this motion.

Some complaint is made of instructions given. We have examined these complaints and find them not to be well founded. The instructions given fairly presented the law of the case to the jury.

Complaint is made that the court overruled the motion for a new trial. In so far as that raised questions previously determined herein nothing more need be said. It is contended that there was misconduct of counsel for the state in the closing argument to the jury, and some language is set out which, standing alone, seems objectionable. However, we were told in the oral argument in this court that this language was used answering the same point argued by counsel for the defendant. That statement was not denied. There is no showing in this record that the statement was not correct. Certainly an attorney cannot argue a matter from his viewpoint and then complain that counsel on the other side also argues it from his

viewpoint. The result is that there is no showing of error in this respect.

Defendant did not testify. His wife and son were called as witnesses in his behalf and gave testimony. Counsel for the state in the argument to the jury commented on the testimony of the wife and son. Appellant contends this was an indirect reference to the fact that defendant did not testify, in violation of R. S. 62-1420. It cannot be so construed. Counsel had the right to comment fairly on testimony which was in fact given.

We find no error in the record. The judgment of the court below is affirmed.